800

REGION 8 FOREST SERVICE TIMBER PURCHASERS COUNCIL, Hankins Lumber Company, Inc., Hood Industries, Inc., Hunt Plywood Company, Inc., Southern Timber Purchasers Council, Plaintiffs–Appellants,

v.

John E. ALCOCK, in his Official Capacity as Regional Forester for Region 8 of the U.S. Forest Service; F. Dale Robertson, in his Official Capacity as Chief of the U.S. Forest Service; James W. Pulliam, Jr., in his Official Capacity as Regional Director of Region 4 of the U.S. Fish and Wildlife Service; Manuel Lujan, in his Official Capacity as Secretary of the U.S. Department of the Interior, Defendants–Appellees.

No. 91–8892.

United States Court of Appeals, Eleventh Circuit.

June 21, 1993.

801

Alexander Stephens Clay, IV, Mary Lillian Walker, Kilpatrick & Cody, Atlanta, GA, Steven P. Quarles, Thomas R. Lundquist, John A. MacLeod, Crowell & Moring, Washington, DC, for plaintiffs-appellants.

Daniel A. Caldwell, III, Asst. U.S. Atty., Atlanta, GA, Jean Williams Mellor, Wildlife & Marine Resources Section, and Ellen Athas Ferlo, U.S. Dept. of Justice, Environmental and Natural Resources Div., General Litigation Section, William B. Lazarus, Jacques B. Gelin, Dept. of Justice, Washington, DC, for defendants-appellees.

Before TJOFLAT, Chief Judge, BLACK, Circuit Judge, and JOHNSON, Senior Circuit Judge.

JOHNSON, Senior Circuit Judge:

This case centers on actions taken by the United States Forest Service to protect the red-cockaded woodpecker (the "Woodpecker") in the Southern Region (formerly Region 8) of the National Forest System. The Southern Timber Purchasers Council (formerly Region 8 Forest Service Timber Purchasers Council) (the "Council") is an affiliation of purchasers of national forest timber in the Southern Region. Hankins Lumber Co., Inc., Hood Industries, Inc., and Hunt Plywood Co., Inc., (the "Timber Companies") are members of the Council, and had contracts with the Forest Service to cut timber in national forests in the Southern Region. Together, these parties brought suit against the Secretary of the Interior, as well as various officials of the Forest Service and the Fish and Wildlife Service (collectively, the "Government"), challenging actions taken by the Forest Service to protect the Woodpecker. They now appeal the district court's orders (1) dismissing their claim under the National Environmental Policy Act ("NEPA") for lack of standing, (2) entering summary judgment for the Government on their claims under the Endangered Species Act (the "Species Act") for lack of standing, and (3) entering summary judgment on the merits for the Government on their claim under the National Forest Management Act (the "Forest Management Act"). Because we find that the Council and the Timber Companies lack standing to sue under any of these statutes, we affirm the district court's dismissal of the NEPA claim and entry of summary judgment on the Species Act claims, and we vacate the district court's entry of summary judgment on the Forest Management Act claim with instructions to dismiss the claim for lack of jurisdiction.

## I.  STATEMENT OF THE CASE

### A.  Background facts

The Woodpecker ranges in pine forests throughout the southeastern portion of the United States, living in clans.  Each clan makes its home in groups of live pine trees known as a colony site.  To survive, the Woodpecker needs a foraging habitat with specific characteristics close to the colony site.  Extensive clearing of southeastern pine forests in the first half of this century brought the Woodpecker to the brink of extinction, resulting in the listing of the Woodpecker in 1970 as an endangered species. The vast majority of remaining Woodpecker clans live in colony sites that are located on public lands, principally the various national forests in the Southern Region.

The Species Act requires the Forest Service, in consultation with the Fish and Wildlife Service, to ensure that its actions are not likely to jeopardize the continued existence of any endangered species, such as the Woodpecker.  16 U.S.C.A. § 1536(a)(2) (West 1985); 50 C.F.R. § 402.13–.14 (1992).  To discharge this obligation, in 1985 the Forest Service completed a Woodpecker Chapter for its Wildlife Habitat Management Handbook that was based upon the Fish and Wildlife Service's recommended recovery plan for the Woodpecker.  The Woodpecker Chapter identified certain measures to protect and conserve the Woodpecker.  After engaging in formal consultation, the Fish and Wildlife Service approved the Woodpecker Chapter as submitted by the Forest Service, stating that complete implementation of the Chapter would satisfy the requirements of the Species Act.

In addition to its obligations under the Species Act, the Forest Service is required by the Forest Management Act to prepare a comprehensive land and resource management plan for each national forest.  16 U.S.C.A. § 1604.  Among other things, these comprehensive plans address how wildlife will be managed and approximately how much timber the Forest Service will permit to be harvested annually.  See 16 U.S.C.A. § 1604(e); 36 C.F.R. § 219.1 (1992).  After the Woodpecker Chapter was approved by the Fish and Wildlife Service, the Forest Service incorporated the Woodpecker Chapter into its forest plans for each of the national forests in the Southern Region with a Woodpecker population.

Although the Woodpecker Chapter was incorporated into the forest plans soon after its approval, the Woodpecker population continued to decline.  Realizing that the Woodpecker Chapter might need to be revised, the Forest Service initiated informal consultation with Fish and Wildlife Service in the fall of 1988 regarding proper management for the Woodpecker.  See 50 C.F.R. § 402.13.[1]  Soon thereafter, the Forest Service received eight letters from the Sierra Club Legal Defense Fund threatening citizen suits under the Species Act, see 16 U.S.C.A. § 1540(g)(2), if the Forest Service continued its "inadequate management practices" for protecting the Woodpecker.  The Forest Service proceeded to develop a three-phase strategy for protecting the Woodpecker in conjunction with both the Council and the Sierra Club Legal Defense Fund, and through informal consultation with the Fish and Wildlife Service.

On March 27, 1989, the Forest Service implemented the first phase of its new Woodpecker strategy—the immediate adoption of a temporary policy governing the cutting on timber contracts within ¾ mile of a Woodpecker colony (the "Policy").  The Policy strictly limited the permissible methods for timber harvesting in those areas within ¾ mile of a Woodpecker colony, and was applicable to all awarded and pending timber contracts, advertised timber sales, and proposed timber sales.

The Timber Companies each held contracts subject to the Policy.  Those contracts included an endangered species provision, which permitted the Forest Service to cancel or unilaterally modify the contracts "if the

---

1.  The initiation of informal consultation with the Fish and Wildlife Service followed closely on the heels of the entry of an injunction ordering the Forest Service to take certain measures to protect the Woodpecker in national forests located in Texas.  *See Sierra Club v. Lyng,* 694 F.Supp. 1260 (E.D.Tex.1988), *rev'd in part and aff'd in part sub nom., Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir.1991).

protection measures prove inadequate." [2] The Policy directed Forest Service contracting officers to request the holders of timber contracts to suspend logging on the restricted areas pursuant to the endangered species clause, and instructed the contracting officers to "[m]ake maximum possible effort to provide timber for deleted volumes" by mutual contract modification. If modification would change the sale conditions so significantly that the purchaser could not recover its original profit margin, the Policy authorized the cancellation of the contract. Each of the Timber Companies agreed to modify all of their contracts subject to the Policy.

## B. Procedural history

### 1. *Administrative procedure*

On March 31, 1989, the Council appealed the adoption of the Policy, alleging violations of the Administrative Procedure Act, NEPA and the Forest Management Act. *See* 36 C.F.R. § 217. The Forest Service rejected the appeal, stating that the adoption of the Policy was not subject to administrative appeal. *See* 36 C.F.R. § 217.3(a)(1). However, the Forest Service directed the Regional Forester for the Southern Region (1) to conduct an environmental analysis, *see* 40 C.F.R. § 1508.9 (1992), and (2) to prepare an appropriate decision document referencing the Species Act, NEPA, and the Forest Management Act.

The Regional Forester complied with this directive by (1) issuing a biological evaluation of the Policy's effects and (2) issuing a decision on June 26, 1989, that documented the rationale and environmental considerations behind the Policy. The Council appealed the Regional Forester's decision, and notified the Secretaries of the Interior and Agriculture that it intended to file a citizen suit under the Species Act. *See* 16 U.S.C.A. § 1540(g)(2). On October 25, 1989, the Associate Deputy Chief of the Forest Service affirmed the prior decision of the Regional Forester.

### 2. *District court*

On December 7, 1989, the Council and the Timber Companies filed a four count complaint for declaratory and injunctive relief alleging (1) that the Forest Service had failed to fully implement the Woodpecker Chapter in violation of the Species Act, 16 U.S.C.A. § 1536, and that the Forest Service had illegally adopted the Policy (2) in violation of the Species Act, 16 U.S.C.A. § 1536, (3) in violation of NEPA, 42 U.S.C.A. § 4332(2) (West 1977), and (4) in violation of the Forest Management Act, 16 U.S.C.A. § 1604(g).

On the Government's motion, the district court dismissed the NEPA claim on the ground that the Council and the Timber Companies lacked standing under NEPA to bring suit. After extensive briefing, the district court entered summary judgment for the Government on the remaining claims, holding that the Council and the Timber Companies lacked standing to bring suit under the Species Act and that the Forest Service's adoption of the Policy did not violate the Forest Management Act.

## II. DISCUSSION

■ "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.' " *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). "[T]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Id.* Accordingly, the "case or controversy" requirement is of special importance in cases where a federal court is being asked to rule on the legality of an act of the executive branch. *E.g., Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2135, 119 L.Ed.2d 351 (1992) (asking court to rule on legality of regulation promulgated by Secretary of Interior); *Allen,* 468 U.S. at 743–45, 104 S.Ct. at 3320–21 (asking court to rule on constitutionality of IRS guidelines governing tax-exempt status for private schools); *Valley Forge College v. Americans United for Separation of Church*

---

**2.** The contracts also contained a dispute resolution clause stipulating that the Contract Disputes Act, 41 U.S.C.A. §§ 601–613 (West Supp.1993),

applied to "all disputes arising under or relating to this contract."

*and State, Inc.*, 454 U.S. 464, 469, 102 S.Ct. 752, 756–57, 70 L.Ed.2d 700 (1982) (asking court to rule on constitutionality of transfer of government property by Secretary of Health, Education and Welfare to college operated by religious order).

▆▆▆ A central component of Article III's "case or controversy" requirement is that the litigant must have standing to invoke the power of the federal court. *Allen,* 468 U.S. at 750, 104 S.Ct. at 3324. To have standing, a plaintiff must satisfy three constitutional requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2136 (citations omitted). In addition to these constitutional requirements, there are three prudential limits on standing: first, the plaintiff must assert its own rights and interests and may not rely on the rights and interests of others; second, the federal courts will not adjudicate "abstract questions of wide public significance;" and third, the plaintiff's complaint must fall within the "zone of interests" to be protected by the statute in question. *Valley Forge,* 454 U.S. at 474–75, 102 S.Ct. at 759–60 (citing cases).[3]

**A. The injuries allegedly suffered by the Council's members and the Timber Council**

Before we consider whether the Council and the Timber Companies have standing, we must determine what injuries to consider in performing our standing analysis. In their complaint, the Council and the Timber Companies alleged that they suffered three types of injuries as a result of the Forest Service's failure to fully implement the Woodpecker Chapter as required by the Species Act and its subsequent adoption of the Policy in violation of the Species Act, NEPA, and the Forest Management Act: (1) economic injuries; (2) environmental injuries; and (3) procedural injuries. After the district court dismissed their NEPA claim for lack of standing, the Council and the Timber Companies filed a motion for reconsideration. In connection with their motion for reconsideration, the Council and the Timber Companies submitted several affidavits which both supported the original allegations and contained new allegations of "quality of life" injuries. The district court granted the motion for reconsideration and considered the affidavits, but reaffirmed its earlier order dismissing the NEPA claim for lack of standing.

▆▆▆ On appeal, the Government contends that the district court erred in considering the affidavits because they go beyond the complaint. Because the affidavits were considered by the district court in conjunction with the grant of the motion for reconsideration, we must determine whether it was error for the district court to grant that motion. This Court has never explicitly considered the standard of review to be applied to a district court's grant of a motion for reconsideration of a non-final judgment.[4] Howev-

---

**3.** Finally, even if the constitutional and prudential components of standing are satisfied, three additional requirements are imposed upon a voluntary membership organization—like the Council—that seeks standing to sue on behalf of its members: (1) its members must otherwise have standing to sue in their own right; (2) the interests it seeks to protect must be germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested must require the participation of the association's individual members. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441,

53 L.Ed.2d 383 (1977). For the reasons discussed below, we conclude that the Council's members do not otherwise have standing to sue. Thus, we do not consider whether the Council has satisfied the other requirements for associational standing.

**4.** Because the order dismissed only one of the four claims, it was not a final judgment. *See* FED.R.CIV.P. 54(b) ("any order or form of decision, however designated, which adjudicates fewer than all the claims ... is subject to revision at

er, when reviewing a district court's disposition of a motion for reconsideration after final judgment,[5] we have consistently stated that the decision to grant such relief is committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion. *E.g., American Home Assur. Co. v. Glenn Estess & Assocs.,* 763 F.2d 1237, 1238–39 (11th Cir. 1985) (Rule 59(e) motion for reconsideration); *Commodity Futures Trading Comm'n v. American Commodity Group Corp.,* 753 F.2d 862, 866 (11th Cir.1984) (Rule 60(b) motion for reconsideration). We see no reason to apply a different standard when the party seeks reconsideration of a non-final order.

■] We hold that the district court did not abuse its discretion by granting the motion for reconsideration and considering the affidavits submitted by the Council and the Timber Companies. "[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth v. Seldin,* 422 U.S. 490, 510, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). The affidavits raising the quality of life injuries which were attached to the motion for reconsideration are "particularized allegations of fact" which support the Council's and the Timber Companies' standing. Thus, the district court did not abuse its discretion in considering those affidavits.[6]

B. Standard of Review

■] Whether the Council and the Timber Companies have standing to bring suit is a threshold legal issue subject to de novo review. *United States v. 5000 Palmetto Drive,* 928 F.2d 373, 375 (11th Cir.1991); *United States v. Massell,* 823 F.2d 1503, 1506 n. 2 (11th Cir.1987). However, the nature of our review turns on the stage in the proceedings at which standing is controverted. *See Defenders of Wildlife,* — U.S. at — —, 112 S.Ct. at 2136–37. When the defendant challenges standing via a motion to dismiss, "both trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. Moreover, in making its determination, the trial court is not restricted to the face of complaint—it is free to rely on affidavits submitted by the plaintiff in support of the complaint. *Id.* When the attack on standing occurs via a motion for summary judgment, the plaintiffs can no longer rest on their allegations, "but must 'set forth' by affidavit or other evidence 'specific facts' which for the purpose of summary judgment will be taken as true." *Defenders of Wildlife,* — U.S. at — —, 112 S.Ct. at 2137 (citing FED.R.CIV.P. 56(e)). Finally, when standing is questioned for the first time by an appellate court, standing "must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107

---

any time before the entry of judgment adjudicating all the claims").

5. A motion for reconsideration made after final judgment falls within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief from judgment or order). *Inglese v. Warden,* 687 F.2d 362, 363 n. 1 (11th Cir.1982); *Woodham v. American Cystoscope Co.,* 335 F.2d 551, 554–55 (5th Cir.1964).

6. We note that had the Council and the Timber Companies moved to amend their complaint after dismissal to allege these quality of life injuries rather than making a motion for reconsideration, the district court would have been well within the bounds of its discretion to allow the amendment. *See Czeremcha v. International Ass'n of Machinists,* 724 F.2d 1552, 1556 (11th Cir.1984) (motion for leave to amend complaint after dismissal for lack of jurisdiction "should be granted

liberally"). *See also NAACP v. Town of Harrison,* 907 F.2d 1408, 1417 (3d Cir.1990) (holding that district court abused its discretion in refusing to permit plaintiff to amend its complaint after dismissal for lack of standing).

Indeed, the Council and the Timber Companies could have moved *this* court to amend their complaint to include the quality of life injuries. Lack of standing is a jurisdictional defect, *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986), and under 28 U.S.C.A. § 1653 (West 1966) "[d]efective allegations of jurisdiction may be amended upon terms, in the trial or appellate courts." *But see Gillis v. United States Dep't of Health and Human Servs.,* 759 F.2d 565, 571 n. 9 (6th Cir.1985) (expressing doubt about § 1653's applicability to defective allegations of standing).

L.Ed.2d 603 (1990) (citing cases).[7] *See Cone Corp. v. Florida Dep't of Transp.*, 921 F.2d 1190, 1206 n. 50 (11th Cir.1991) (looking at deposition and hearing testimony to determine whether plaintiffs had standing), *cert. denied,* —— U.S. ——, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991).

In this case, we are faced with the unique situation of applying each of these standards to determine whether the Council and the Timber Companies have standing: standing under NEPA was challenged via a motion to dismiss;[8] standing under the Species Act was challenged via a motion for summary judgment; and standing under the Forest Management Act is being raised for the first time by this court.[9] In the final analysis, however, we review the same documents to determine whether the Council and the Timber Companies have standing to sue under NEPA, the Species Act, or the Forest Management Act—the complaint and the affidavits constitute the reviewable record on appeal with regard to each standing inquiry.

### C. Analysis of the injuries alleged

#### 1. *Economic injuries*

The Council and the Timber Companies allege three economic injuries flowing from the failure of the Forest Service to either fully implement the Woodpecker Chapter or comply with the procedural dictates of NEPA, the Species Act and the Forest Management Act in adopting the Policy: (1) a reduction in available timber under the contracts; (2) increased logging costs under the contracts; and (3) a reduction in the future timber supplies.

The first two injuries are not jurisdictionally cognizable by this court, because they arise out of contracts with the United States. The Timber Companies' contracts provide that "all disputes arising under or relating to" the contracts are to be resolved in accordance with the Contract Disputes Act (the "CDA").[10] The effect of that provision is to strip the district court of jurisdiction over any claim founded upon the contract. *See* 28 U.S.C.A. § 1346(a)(2) (West Supp.1992) ("the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States ... which are subject to ... the Contract Disputes Act").

■■■ Whether an action is founded upon a contract is determined by looking to the source of the rights upon which the plaintiff bases its claims and the nature of relief sought. *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C.Cir.1982). Had the Council

---

7. In examining the record, we will assume the truth of the affidavits submitted by the Council and the Timber Companies.

8. The district court erroneously stated that by considering the affidavits attached to the motion for reconsideration, it had converted the motion to dismiss into a motion for summary judgment. This error was predicated upon a misunderstanding of the conversion feature of Rule 12(b). Because a motion to dismiss for lack of standing is one attacking the district court's subject matter jurisdiction, it is brought pursuant to Rule 12(b)(1). *Cone Corp.,* 921 F.2d at 1203 n. 42; *Morast v. Lance,* 807 F.2d 926, 932 n. 6 (11th Cir.1987). The conversion feature of Rule 12(b), however, is limited to motions to dismiss for failure to state a claim brought pursuant to Rule 12(b)(6). *Stanley v. CIA,* 639 F.2d 1146, 1158 (5th Cir.1981). *See generally Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987) (discussing distinction between 12(b)(1) and 12(b)(6)).

9. The failure of the Government to raise the issue of standing under the Forest Management Act and the district court's failure to consider the issue below in no way impinges upon our ability to consider the issue for the first time on appeal. "The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.' " *FW/PBS,* 493 U.S. at 230, 110 S.Ct. at 607 (quoting *Allen v. Wright,* 468 U.S. at 750, 104 S.Ct. at 3324). *See Church of Scientology Flag Service Org., Inc. v. City of Clearwater,* 777 F.2d 598, 606 (11th Cir.1985) ("A plaintiff does not acquire standing merely because the defendant raises no objection."), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 656 (1986).

10. Even if the contracts did not so provide, the CDA would apply to the Timber Companies' contract claims. *See* 41 U.S.C.A. § 602(a)(4) ("applies to any express or implied contract ... entered into by an agency for the disposal of personal property"). *See .also North Side Lumber Co. v. Block,* 753 F.2d 1482, 1486 (9th Cir.) (timber contract falls within the Contract Disputes Act), *cert. denied,* 474 U.S. 919, 106 S.Ct. 248, 88 L.Ed.2d 256 *and cert. denied,* 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985).

and the Timber Companies sought contractual relief for their contractual injuries, the CDA would have divested the district court of jurisdiction to hear their claims. However, by grounding their complaint in NEPA, the Species Act and the Forest Management Act, the Council and the Timber Companies seek to avoid this result. *Cf. Megapulse,* 672 F.2d at 968–69 (jurisdiction where claim based on Trade Secrets Act). Now that their standing to bring suit under these statutes is questioned, the Council and the Timber Companies point to the contracts as the source of their injuries. To permit this would allow the Council and the Timber Companies to avoid the express mandate of Congress that claims arising out of a contract with the United States be heard pursuant to the process set forth in the CDA rather than in district court. *See* 41 U.S.C.A. §§ 601–613; 28 U.S.C.A. § 1346(a)(1). Although the Council and the Timber Companies are free to bring claims under NEPA, the Species Act and the Forest Management Act, they may not predicate their standing to sue under those statutes upon contractual injuries.[11]

▇▇▇ In addition to their injuries under the contracts, the Council and the Timber Companies allege that the actions of the Forest Service economically injure them by reducing the amount of timber available for future contracts. This injury fails for two reasons. First, no right is conferred on the Timber Companies to harvest a set amount of timber each year. The Forest Management Act requires the Forest Service to determine harvest levels, 16 U.S.C.A. § 1604(e),

but to "limit the sale of timber to a quantity *equal to or less than* a quantity which can be removed for such forest annually in perpetuity on a sustained yield basis," 16 U.S.C.A. § 1611(a) (emphasis supplied). Indeed, the Council and the Timber Companies have no right to compel the Forest Service to sell any future timber to them. *See Intermountain Forest Industry Ass'n v. Lyng,* 683 F.Supp. 1330, 1340 (D.Wyo.1988) (timber companies have no right to future timber).[12]

Second, even if the Council and the Timber Companies could be said to have a right to future timber, this injury fails to satisfy the third constitutional element of standing—there is not a "substantial likelihood" that this injury will be redressed by the relief they seek. *See Duke Power Co. v. Carolina Env'l Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631, n. 20, 57 L.Ed.2d 595 (1978). By this action, the Council and the Timber Companies seek an order requiring the Forest Service to fully implement the Woodpecker Chapter and to set aside the Policy because it does not comply with procedures mandated by NEPA, the Species Act, and the Forest Management Act. Whether this relief would result in greater timber availability in the future is purely speculative. The amount of timber available in the future is based upon site-specific analyses, *see* 16 U.S.C.A. § 1604(g)(3)(E)–(F), which may or may not be affected by either full implementation of the Woodpecker Chapter or setting aside the Policy. *Cf. ASARCO Inc. v. Kadish,* 490 U.S. 605, 614, 109 S.Ct. 2037, 2043, 104 L.Ed.2d 696 (1989) (denying standing where question of whether injury

---

**11.** The Council and the Timber Companies rely entirely on *National Helium Corp. v. Morton,* 455 F.2d 650 (10th Cir.1971), to support their contention that the CDA does not bar our consideration of their contract injuries in assessing whether they have standing. In *National Helium,* a corporation whose government contract was terminated brought suit, alleging that the termination was subject to the requirements of NEPA. The Tenth Circuit agreed, and ordered the Secretary of the Interior to comply with NEPA before terminating the contract. While superficially similar to the case before us, *National Helium* contains no discussion of the corporation's standing to bring suit under NEPA. Thus, it is possible that the plaintiff in *National Helium* suffered a non-contractual injury sufficient to confer standing under NEPA. To the extent that *National Helium* supports the notion

that an injury arising out of a government contract will support a non-contract action, we disagree.

**12.** The Council and the Timber Companies argue that their position is analogous to that of a losing bidder on a government contract. *See Choctaw Mfg. Co., Inc., v., United States,* 761 F.2d 609, 615 (11th Cir.1985) (losing bidder has standing to challenge award of government contract). The Council and the Timber Companies fail to appreciate that a losing bidder has a right that bid procedures be conducted in accordance with the applicable statutes and regulations, and that its bid not be arbitrarily rejected. *Id.* at 615–16. No such right is conferred upon the Timber Companies.

would be redressed by favorable decision "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict").

## 2. *Quality of life injuries*

■ The Council and the Timber Companies allege three quality of life injuries caused by the Forest Service's failure to fully implement the Woodpecker Chapter or comply with the procedural requirements of NEPA, the Species Act and the Forest Management Act in adopting the Policy: (1) layoffs and income reductions; (2) a decreasing tax base; and (3) a loss in public services.[13] These quality of life injuries are simply attenuated versions of the economic injuries we have already considered. The Council and the Timber Companies allege that they will suffer these injuries because less timber is available under the contracts and less timber will be available in the future. Accordingly, they suffer from the same infirmities as the economic injuries—to the extent the injuries arise out of the timber contracts, they will not support claims under NEPA, the Species Act or the Forest Management Act; to the extent they will result from a decrease in future timber availability, the Council and the Timber Companies have no right to future timber. Thus, the quality of life injuries do not provide a basis for standing.

## 3. *Environmental injury*

■ In addition to their economic injuries, the Council and the Timber Companies also allege an environmental injury caused by the Forest Service's failure to fully implement the Woodpecker Chapter or to follow the proper procedures in enacting the Policy. Specifically, they claim to be "interested in

developing [Woodpecker] strategies which are consistent with forest plans, are scientifically defensible, and do not impose unwarranted restrictions on timber harvesting." Standing alone, this alleged injury does not satisfy the injury-in-fact requirement of standing. To support a plaintiff's standing to sue, the injury alleged must be personal. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The Council and the Timber Companies, by contrast, have alleged nothing more than an interest in developing Woodpecker strategies, and a mere interest in a problem, no matter how longstanding the interest, is insufficient to confer standing. *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

■ To give focus to their otherwise generalized interest in Woodpecker strategies, the Council and the Timber Companies claim that their interest is at least partly motivated by their employees' interest in the outdoors.[14] This attempt by the Council and Timber Companies to rely on their employees' interest in the environment runs afoul of the prudential limitation that plaintiffs must assert their own rights and may not rest upon the rights of others. *See Warth*, 422 U.S. at 499, 95 S.Ct. at 2205. We deviate from this limitation only when (1) the plaintiff seeking to assert the third party's rights has otherwise suffered an injury-in-fact, (2) the relationship between the plaintiff and the third party is such that the plaintiff is nearly as effective a proponent of the third party's right as the third party itself, and (3) there is some obstacle to the third party asserting the right. *Singleton v. Wulff*, 428 U.S. 106, 113–16, 96 S.Ct. 2868, 2873–75, 49 L.Ed.2d 826 (1976).

*See Williamsport Area School Dist.*, 475 U.S. at 547, 106 S.Ct. at 1334 (facts supporting standing "may not be gleaned from the briefs and arguments themselves").

---

**13.** In their brief on appeal, the Council and the Timber Companies attempt to supplement these injuries, arguing that their quality of life will be affected by a decrease in receipts from the Forest Service, which will result in a loss of public services. Under 16 U.S.C.A. § 500, 25% of Forest Service timber receipts are returned to local counties "for benefit of the public schools and public roads." As this injury is being alleged for the first time in their appellate brief, we may not consider it now, because our standing review is restricted to the complaint and the affidavits.

**14.** The Council and the Timber Companies also argue that their interest in Woodpecker strategies is motivated by their economic injuries. For the reasons previously discussed, these injuries are insufficient to confer standing.

] None of these elements are satisfied in this case. First, as previously discussed, the Council and the Timber Companies have not suffered an injury-in-fact. Second, in this case the employee/employer relationship is not such that the employer would be nearly as effective a proponent as the employees. In cases allowing third-party standing, the relationship between the party asserting the right and the third party has been characterized by a strong identity of interests which is absent in an employer/employee relationship. *See, e.g., Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 840–42, 97 S.Ct. 2094, 2107–08, 53 L.Ed.2d 14 (1977) (parents had standing to assert rights of children); *Griswold v. Connecticut*, 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965) (doctor had standing to assert rights of patients). Finally, there is no obstacle to the employees bringing suit to protect their own interest in the environment. *Cf. NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) (individual members of NAACP could not resist court order on first amendment grounds without nullifying their first amendment right). Thus, we will not permit the Council and the Timber Companies to assert their employees' interest in the environment to gain standing in this case.[15]

### 4. *Procedural injuries*

Finally, the Council and the Timber Companies allege that the failure of the Forest Service to comply with the procedures mandated by NEPA, the Species Act, and the Forest Management Act in adopting the Policy injured their rights to information, participation, and informed decision making.

These injuries are nothing more than generalized grievances which fail to satisfy the injury-in-fact requirement for standing.

A similar injury was before the Supreme Court in *Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2142–2146, where the Court considered a challenge by several environmental groups to a regulation promulgated by the Secretary of Interior. The environmental groups argued that they had standing to challenge the Secretary's failure to follow the correct procedure in enacting the regulation because the Species Act conferred upon them a right to have the correct procedures followed. The Supreme Court denied the environmental groups standing on this ground, stating that the alleged injury to the plaintiffs' procedural rights was nothing more than a "generalized grievance about government" which "does not state an Article III case or controversy." *Id.* at ——, 112 S.Ct. at 2143. Like the procedural injuries asserted by the environmental groups in *Defenders of Wildlife,* the injuries asserted by the Council and the Timber Companies to their rights to participation, information, and informed decision making are generalized grievances which do not state an Article III controversy. The asserted injuries are not peculiar to the Council and the Timber Companies, but rather are shared by all citizens.[16]

In reaching its holding, the Supreme Court noted that if the environmental groups had suffered an injury to a separate concrete interest, they would have had standing to assert a procedural injury. *Id.* at —— n. 7, 112 S.Ct. at 2142 n. 7. The Council and the Timber Companies rely on this statement, arguing that unlike the environmental groups

---

**15.** The district court also concluded that the Council and the Timber Companies lacked standing to assert the interests of their employees. However, rather than using the third-party standing analysis to reach this conclusion, the district court used the three part test for associational standing set forth in *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. Although we agree with the district court's conclusion, we do not agree with the its method. The associational standing test articulated in *Hunt* is properly reserved for voluntary membership organizations—like trade associations or environmental groups—and has no application to a corporation's standing to assert the interests of its employees. *See* 13 CHARLES A. WRIGHT ET AL, FEDERAL PRACTICE AND PROCEDURE

§ 3531.9 at 617 (2d ed. 1984) ("The greatest care should be taken with associations whose members have little choice whether to be members and have divergent interests.").

**16.** This is not a case where the failure to follow a mandated procedure caused a distinct injury, different from that suffered by the public generally. *See Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 83–85 (D.C.Cir.1991) (discussing how injury to right to information might support standing where the purpose of the organization seeking the information was to disseminate the information).

in *Defenders of Wildlife*, they have suffered an injury to a separate concrete interest. This argument fails. As our previous discussion makes clear, neither their alleged economic injuries, quality of life injuries, or environmental injuries constitute injury to a separate concrete interest. Thus, the Council and the Timber Companies do not have standing to assert their procedural injuries.

### III. CONCLUSION

In sum, we hold that the Council and the Timber Companies have failed to establish an injury to themselves sufficient to confer standing. Accordingly, we AFFIRM the district court's dismissal of the NEPA claim for lack of jurisdiction and entry of summary judgment in favor of the Government on the Species Act Claim. Because we conclude that the Council and the Timber Company lacked standing to bring suit under the Forest Management Act, the district court lacked jurisdiction to adjudicate this claim. Accordingly, we VACATE the judgment of the district court with respect to the Forest Management Act claim with directions to dismiss that portion of the action.