[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-12507

_____

D. C. Docket No. 89-00984-CV-KMM

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/01/00
THOMAS K. KAHN
CLERK

FLORIDA ASSOCIATION OF REHABILITATION
FACILITIES, INC., UNITED CEREBRAL PALSY
ASSOCIATION OF MIAMI, INC., et al.,

Plaintiffs-Appellees,

versus

STATE OF FLORIDA DEPARTMENT OF HEALTH
AND REHABILITATIVE SERVICES,
GREGORY COLER, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 1, 2000)

Before TJOFLAT, MARCUS, and CUDAHY,[*] Circuit Judges.

_____

[*]Honorable Richard D. Cudahy, U.S. Circuit Judge for the Seventh Circuit, sitting by
designation.

MARCUS, Circuit Judge:

This appeal involves difficult questions of mootness as well as the Eleventh Amendment. Plaintiffs, providers of Medicaid services to developmentally-disabled persons, sued various State of Florida officials seeking injunctive and declaratory relief for alleged violations of the Boren Amendment, which established federal standards governing state plans for reimbursing Medicaid providers. In September 1991 the district court entered a preliminary injunction essentially directing the Defendants to comply with the Boren Amendment. Not until April 1999, however, did the district court enter its final order concluding that Defendants had violated the Boren Amendment and directing Defendants to correct their reimbursement plan prospectively as well as retrospectively to 1991. In the meantime, Congress repealed the Boren Amendment in 1997, and Defendants contend that before entry of judgment they had already enacted a new rate plan in accordance with the requirements of the Boren Amendment's successor.

Defendants argue on appeal that these developments render some or all of Plaintiffs' claims moot, and that in any event the relief ordered by the district court is barred by the Eleventh Amendment to the extent it effectively requires the State to pay money to redress pre-judgment violations. Because the Eleventh Amendment bars retrospective relief affecting the state treasury in this case, we

2

vacate the district court's judgment to that extent. We remand for determination of whether Plaintiffs' entitlement to prospective relief had become moot by the time of judgment.

## I.

Although the facts of this case are relatively straightforward, its procedural history is anything but. Plaintiffs include the Florida Association of Rehabilitation Facilities, Inc. and several operators of intermediate care facilities for the developmentally disabled ("ICF/DDs"). Plaintiffs provide essential developmental and health care services to low income persons in numerous ICF/DDs throughout the State of Florida. A number of Plaintiffs operate and provide care in ICF/DDs located on land owned by the State -- so-called "cluster" facilities. The care provided in the cluster facilities is the same as that provided in the private facilities.

Plaintiffs began this lawsuit in 1989, asserting that Defendants -- various Florida officials responsible for formulating and administering the State's ICF/DD Medicaid Program -- violated federal law by failing to reimburse Plaintiffs for reasonable costs incurred as a result of providing care and treatment to Florida's developmentally disabled citizens residing in ICF/DDs.[1] The suit alleged as well

---

[1]As originally pled, Plaintiffs' suit also included claims against the Florida Department of Health and Rehabilitative Services ("HRS"). In an order dated April 16, 1996, the district court

that Defendants violated federal law by reimbursing certain cluster providers inadequately through fixed-rate contracts.[2]

Plaintiffs' claims arose under the federal Medicaid program, established by Title IX of the Social Security Act, 42 U.S.C. § 1396, et seq.  This program is a cooperative federal-state effort to furnish with public assistance people who are unable to meet the cost of necessary medical services.  Unlike major federal entitlement programs such as Social Security, Supplemental Security Income, and Medicare, Medicaid is not a federally-administered program with a uniform set of statutorily-defined benefits; rather, it is a state-administered program where the costs of services are allocated between the federal government and the states.  No state is obligated to participate in the Medicaid program.  If a state opts to participate in the Medicaid program, however, it must do so in a manner that complies with federal statutory and regulatory requirements.  See 42 U.S.C. § 1396n.  Within the general framework of federal law, states that choose to

dismissed on Eleventh Amendment grounds all claims against HRS.  Defendants observe that the final judgment nevertheless extends to HRS's successor, the State of Florida Agency for Health Care Administration.  It is not clear that the district court intended that to be so.  To avoid any confusion, we emphasize the Agency for Health Care Administration -- like its predecessor -- is plainly entitled to Eleventh Amendment immunity.  See infra at 23.  Plaintiffs' original complaint additionally included claims against state officials in their individual capacities; those claims were dismissed pursuant to the parties' stipulation in the district court's April 16, 1996 order.

[2]Plaintiffs' suit also included an Equal Protection claim which the district court never reached.

participate in the Medicaid program (thus qualifying for federal financial aid covering the medical assistance costs of eligible individuals) are granted broad latitude in defining the scope of covered services as well as many other key characteristics of their programs. Florida, like all other states, participates in the Medicaid program.

At the time this suit was filed in 1989, and until October 1, 1997, the Boren Amendment applied to the reimbursement claims at issue. The Boren Amendment to the Medicaid Act, formerly codified at 42 U.S.C. § 1396(a)(13)(A), authorized a "state plan to provide . . . for payment . . . of the hospital services . . . through the use of rates . . . which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate . . .." Thus, the Amendment required that states pay ICF/DD providers under rates "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and federal laws, regulations and quality and safety standards." Id. The purpose of the Boren Amendment was "to give states greater flexibility in calculating reasonable costs and in containing the continuing escalation of those costs." Children's Hospital and Health Ctr. v. Belshe, 188 F.3d 1090, 1093-94 (9th Cir. 1999) (citation and internal quotation marks omitted), cert. denied, 120 S. Ct. 2197 (2000).

As the Ninth Circuit has summarized:

> [T]he Boren Amendment authorizes states to develop their own Medicaid reimbursement standards and methodologies for payment of hospital services, but subjects those standards and methodologies to three general federal requirements. First, states must take into account hospitals serving a disproportionate share of low-income patients. Second, states must make findings that the rates are reasonable and adequate to meet the necessary costs of an efficiently operated hospital. And third, states must assure Medicaid patients reasonable access to inpatient hospital care.

Id. (citations and internal quotation marks omitted). Although the Boren Amendment was intended to grant states greater freedom "in establishing the methodology for their reimbursement rates, the amendment was 'not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care.'" Tallahassee Mem'l Reg'l Med. Ctr. v. Cook, 109 F.3d 693, 704 (11th Cir. 1997) (citing S. Rep. No. 139, 97th Cong., 1st Sess., at 478, reprinted in 1981 U.S.C.C.A.N. 396, 744).

On September 13 1991, the district court entered a preliminary injunction in Plaintiffs' favor, finding specifically that Defendants, in violation of the Boren Amendment, were not adequately reimbursing Plaintiffs for the costs of providing ICF/DD care. The district court found that Defendants' use of fixed-rate contracts for payment of cluster providers (i.e., private providers of ICF/DD care in state-

6

owned facilities) also violated the Medicaid Act. The district court enjoined Defendants from reimbursing providers at inadequate rates, making that ruling retroactive to September 4, 1991 (the date of the preliminary injunction hearing). The court also enjoined Defendants from reimbursing cluster providers "in a manner other than as provided in a Rate Plan" at the "full Medicaid rate." The court further ordered that Defendants file by October 4, 1991 a rate plan complying with the substantive standards of the Boren Amendment. Defendants filed a rate plan by the required date and did not appeal the preliminary injunction.

Defendants insist that Plaintiffs never filed any objection to the new rate plan or the rates paid under it. As best we can tell from the record, Defendants are correct. Although Plaintiffs filed multiple motions for contempt or sanctions, only two of those motions implicated the preliminary injunction order, and none squarely challenged either the lawfulness of the plan or the specific rates.[4]

---

[4]In January 1993 Plaintiffs moved for contempt based on Defendants' alleged failure to reimburse certain costs of Plaintiff Ann Storck Center. The motion was based not only on the preliminary injunction, but also on a separate court order entered in November 1991 as well as on the court's inherent powers. In opposition to the motion, Defendants asserted that they were complying with the preliminary injunction and that the relevant costs were excluded because the Ann Storck Center's status had changed. The motion was withdrawn in March 1993. In July 1996 Plaintiffs moved for contempt alleging that certain planned enactments by the Florida Legislature regarding the status of private providers would violate the preliminary injunction. Defendants countered, among other things, that the Legislature's action did not offend the preliminary injunction because it simply changed the status of the providers. The district court denied the motion without prejudice, permitting Plaintiffs to renew the motion or to raise the issue at trial. Plaintiffs never renewed the motion, and the matter was not expressly addressed in the district court's findings and conclusions after trial.

Plaintiffs contend that Defendants were always on notice of their objections to the plan and to the State's post-injunction reimbursement practices.

While the case remained pending before the district court (due in part to repeated continuances sought by Defendants), the Boren Amendment was repealed effective October 1, 1997. See Balanced Budget Act of 1997, Pub. L. 105-33, § 4711(a)(1), 111 Stat. 251, 507-08 (1997). Congress amended the Medicaid Act to "eliminate the Boren Amendment and establish instead a [public] notice and comment provision." Belshe, 188 F.3d at 1093 (citation and internal quotation marks omitted). The new provision repeals the substantive limitations of, and the methodology set forth in, the Boren Amendment, substituting a "public process" for determining rates.

The successor statute requires that a state plan for medical assistance:

> (13) provide –
>
>> (A) for a public process for determination of rates of payment under the plan for hospital services . . . under which --
>>
>>> (i) proposed rates, the methodologies under-lying the establishment of such rates, and justifications for the proposed are published,
>>>
>>> (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,

8

> (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
>
> (iv) in the case of hospitals, such rates take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs.

42 U.S.C. § 1396a(a)(13)(A). The legislation explicitly states that the repeal has only <u>prospective</u> effect and that Boren Amendment rate standards continue to apply to payment for items and services provided on or before October 1, 1997. Pub. L. 105-33, § 4711(d) ("This section shall take effect on the date of the enactment of this Act and the amendments made by subsections (a) and (c) shall apply to payment for items and services furnished on or after October 1, 1997."). Notably, the legislation is silent as to what standards, if any, govern the period between October 1, 1997 and a state's adoption of a new post-Boren rate plan under the successor statute's notice-and-comment procedure.

Shortly after the Boren Amendment was repealed, in August 1997, Defendants moved for summary judgment on Plaintiffs' claims and also to vacate the preliminary injunction. The district court granted the motion in part, and asked the parties for advice as to which issues remained to be litigated. Both parties agreed that three issues remained:

9

1. Whether the method of contractual payment of cluster providers met any federal law requirement to pay them according to a rate plan.

2. What were the minimum requirements for state plans after repeal of the Boren Amendment.

3. Whether cluster providers were currently being paid pursuant to a rate plan that complied with applicable law.

In May 1998, the district court conducted a three-day bench trial on these issues. Defendants moved in limine to bar introduction of evidence of their prior non-compliance with the Boren Amendment and to limit the scope of the trial to their present compliance with federal law. The district court denied the motion but granted Defendants a standing objection to the introduction of evidence of past non-compliance with Boren standards.

On April 11, 1999, the district court entered final judgment in favor of Plaintiffs, stating its findings of fact and conclusions of law in a separate order. Florida Ass'n of Rehab. Facilities, Inc. v. State of Florida Agency for Health Care Admin., 47 F. Supp. 2d 1352 (S.D. Fla. 1999). The court ruled "that Plaintiffs have established that the ICF/DD Rate Plan fails to adequately compensate Plaintiffs as it is not 'reasonable and adequate to meet the costs . . . of efficiently and economically operated facilities,' in violation of the Boren Amendment and 42

U.S.C. § 1983." Id. at 1360.[5] The court noted that "[t]he Boren Amendment was in effect in 1989 when this lawsuit was filed, and was in effect through October 1, 1997." Id. at 1357. Significantly, the court also concluded that even though the Boren Amendment had been repealed effective October 1, 1997, "[t]he standards governing reimbursement set forth in the Boren Amendment continue to apply to this case as the State of Florida has not yet promulgated any rules or regulations, or

---

[5]Because Defendants do not challenge the district court's factual findings, we do not discuss them at length here. It is useful to highlight several of those findings, however, not only to provide further background about the case, but also to underscore the seriousness of the problem created by Defendants' conduct. Among other things, the district court found that because of inadequate reimbursement by Defendants, the majority of Plaintiffs and ICF/DDs in Florida generally operate at a loss. The court concluded that the state's "inadequate reimbursement detrimentally affects ICF/DDs and the quality of services received by the residents. ICF/DDs cannot fairly compete in the marketplace in terms of salaries. Thus, ICF/DDs lose valued and skilled employees who are able to obtain higher wages and salaries elsewhere. ICF/DD facilities, therefore, are forced to hire individuals who may be less experienced, but who will work for less than prevailing wages. This has had a direct and negative impact upon the level and quality of care provided to Medicaid eligible clients treated by ICF/DDs." Id. at 1354-55. The court also determined that "there is a shortage of new ICF/DD beds and there have been no applications to develop new ICF/DD beds in the past five years. There also is a waiting list of individuals requiring ICF/DD services." Id. at 1355. The court found that "Defendants have not analyzed the adequacy of ICF/DD rates to meet the reasonable and necessary costs of an efficiently operated provider . . .[and] have failed to adequately investigate or determine whether the Rate Plan complies with federal requirements." Id. It found that "Defendants have admitted that the terms of the Rate Plan have caused providers to not be reimbursed for certain costs, even when the Defendants had no proof or no reason to believe that the provider was operating inefficiently or had incurred costs for items that were unreasonable or unnecessary." Id. It also found with respect to the cluster providers that "[p]rior to 1991, Defendants did not pay cluster facilities pursuant to the Rate Plan, but instead paid these providers on the basis of non-negotiable, fixed rate contracts that condition reimbursement on appropriations by the State Legislature. Pursuant to these contracts, Plaintiffs are not reimbursed for a substantial portion of their actual costs." Id.

11

enacted any legislation, replacing the Boren Amendment and continues to reimburse ICF/DD providers under the Rate Plan." Id.

The court determined that "[t]he Rate Plan in force in the State of Florida setting forth the terms, conditions and methodology for reimbursement of the costs incurred by ICF/DD providers is inadequate and is inherently flawed." Id. According to the court:

> [T]he Rate Plan formulated and implemented by Defendants fails to substantively comply with the Boren Amendment. Defendants have failed to convincingly rebut or refute evidence introduced by the Plaintiffs establishing that while they operate efficiently and economically, and indeed are required to establish this by submitting cost reports to the State, they are not reimbursed in a manner that is "reasonable and adequate" to allow them to provide care to Florida's developmentally disabled population in compliance with federal laws and regulations. . . . Defendants have also violated the Medicaid Act because of their failure and refusal to reimburse cluster providers pursuant to the Rate Plan. The Medicaid Act provides that the federally required State Plan must provide for payment of ICF/MR medical services "through the use of rates" set forth in the Plan. . . . Neither the regulations nor the Medicaid Act contains any limitation pursuant to a Rate Plan based on ownership of ICF/DD facilities. Thus, cluster facilities are entitled to sufficient reimbursement. Defendants' continued refusal to pay cluster facilities pursuant to the Rate Plan, therefore, violates the Boren Amendment.

Id. at 1358-59.

The district court then discussed its preliminary injunction, observing that "[o]n September 13, 1991, . . . this Court entered a Preliminary Injunction . . . in favor of Plaintiffs on Counts I and III of their Complaint seeking, respectively,

12

adequate and reasonable reimbursement under the Rate Plan in compliance with the Medicaid Act, and seeking payment pursuant to the same Rate Plan, on the same basis as ICF/DDs, to cluster providers." Id. at 1355. The court "adopt[ed] the findings and conclusions . . . in the Preliminary Injunction," id., and found that the factors of irreparable harm, relative injury to the parties, and the public interest all continued to favor injunctive relief. Id. at 1359-60.

As a remedy, the district court ordered the following specific changes to the reimbursement plan retroactive to September 4, 1991 (the compliance date established retroactively in the September 13, 1991 preliminary injunction):

> a. The prospective inflation index shall be the same as the historical (target) rate which Defendants themselves selected, i.e., DRI times 1.786;
>
> b. Three year averaging of cost reports shall be used to calculate rate reductions based on decreases in costs;
>
> c. The cap on rates for new facilities of six beds or less shall be deleted;
>
> d. Settlement of budgeted rates for new providers shall use an average of the relevant rate periods;
>
> e. For providers at small facilities, rates shall be set based on an average (or collectively) for all six bed ICF/DDs operated by that provider;
>
> f. The Defendants shall develop a definable standard for an efficiently operated provider;

13

g.  Increased costs related to increased needs of a client due to changed medical, behavioral or therapeutic needs shall be a basis for an interim rate request;

h.  Cost allocations between levels of care shall be revised (except where such a revision would reduce reimbursement already paid to a provider);

i.  The Defendants shall rebase whenever actual costs exceed actual expenditures for 50% or more of providers in any rate period as shown on KM Schedules of cost reports maintained by Defendants.

Id. at 1360-61, Conclusion ¶ 2.  The district court also ordered that "Defendants shall comply with its published Rate Plan including the immediate rebasing for the 1995 rate setting period where it failed to rebase."  Id. at 1361, Conclusion ¶ 3. Moreover, ordered the Court, "Defendants are enjoined from violation of the Boren Amendment from September 13, 1991 until the State adopts regulations, procedures and standards governing the reimbursement of ICF/DD providers in place of the standards set forth in the Boren Amendment.  Defendants shall amend the Rate Plan accordingly."  Id., Conclusion ¶ 4.

On April 23, 1999, Defendants moved for reconsideration of the final order. Defendants pointed out that in 1998, they had amended the state Medicaid rate plan and taken it through the notice-and-comment process now required by the Boren Amendment's successor.  The amendments had been approved effective October 1, 1998.  Defendants argued that this development mooted Plaintiffs' claims.

14

Attached to the motion was an affidavit from a state official who described the amendment process in detail and noted that at least one of the Plaintiffs (Sunrise Community, Inc.) had unsuccessfully challenged the new plan in the administrative proceeding.

On July 9, 1999, the district court denied Defendants' motion, finding that Defendants had established no good reason for their failure to present the court evidence of these events prior to its final judgment, and that the new evidence would not warrant a modification of the final judgment anyway. This appeal followed.

## II.

There is no dispute about the proper standard of review. We review a district court's conclusions of law de novo. See Doe v. Chiles, 136 F.3d 709, 713 (11th Cir. 1998). We review a district court's grant of injunctive relief for abuse of discretion. See id. (citing Sun America Corp. v. Sun Life Assur. Co. of Canada, 77 F.3d 1325, 1333 (11th Cir. 1996)). We also review the disposition of a motion for reconsideration under an abuse of discretion standard. See Region 8 Forest Service Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993).

## III.

This case is made complicated by its unusual procedural posture. The district court after granting Plaintiffs a <u>preliminary</u> injunction in 1991did not conduct a trial on the merits until 1998 and did not issue a final order of declaratory and injunctive relief until April 1999. As a result of this long lapse, the substantive federal law underlying Plaintiffs' claims, the Boren Amendment, was repealed prior to trial.[6] Defendants make two primary arguments, both of which are tied to the delay between preliminary injunction and final judgment. First, Defendants contend that the Boren Amendment's repeal had mooted Plaintiffs' claims by the time of final judgment. Second, they assert that the relief awarded by the district court violates the Eleventh Amendment to the extent that it requires payment of money from the state treasury for injuries suffered by Plaintiffs prior to the judgment. Defendants do not appeal the merits of the district court's factual

_____

[6]Prior to the repeal of the Boren Amendment, it was well-settled that health care providers under a state Medicaid program could bring actions pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief to redress ongoing violations of the Amendment. <u>See</u> <u>Tallahassee Mem'l</u>, 109 F.3d at 702. Because Defendants and the State of Florida participate in the Medicaid Program, which authorizes the payment of federal funds to states to defray expenses incurred in providing medical assistance to low income individuals, and receive matching funds from the federal government, they are obligated to comply with the requirements of the Medicaid Act and corresponding regulations. <u>See</u> <u>id.</u> at 698-700. Accordingly, in <u>Wilder</u> <u>v. Virginia Hospital Ass'n</u>, 496 U.S. 498, 502, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990), the Supreme Court held that the Medicaid Act and the Boren Amendment created a substantive right, enforceable by health care providers, to ensure reimbursement at rates that are actually reasonable and adequate to meet the costs of efficiently and economically operated facilities providing care to Medicaid patients. Providers were thus permitted to sue in federal court for injunctive relief to ensure that they were reimbursed according to "reasonable and adequate" rates.

16

findings or conclusions of law with respect to their violation of the Boren Amendment and federal Medicaid law. We take up Defendants' mootness and Eleventh Amendment objections in that order.

## A.

Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of "Cases" and "Controversies." U.S. Const. art. III, § 2. "The doctrine of mootness is derived from this limitation because an action that is moot cannot be characterized as an active case or controversy." Adler v. Duval County Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997) (citing Church of Scientology Flag Serv. Org. v. City of Clearwater, 777 F.2d 598, 604 (11th Cir. 1985)).

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969). Put another way, "[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." Ethredge v. Hail, 996 F.2d 1173, 1175 (11th Cir. 1993) (citing United States v. Certain Real & Personal Property, 943 F.2d 1292, 1296 (11th Cir. 1991)). When events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give

17

the plaintiff meaningful relief, the case is moot and must be dismissed.  See Jews

for Jesus, Inc. v. Hillsborough County Aviation Auth., 162 F.3d 627, 629 (11th

Cir. 1998) (citing Pacific Ins. Co. v. General Dev. Corp., 28 F.3d 1093, 1096 (11th

Cir. 1994)).  Any decision on the merits of a moot case or issue would be an

impermissible advisory opinion.  See, e.g., Hall v. Beals, 396 U.S. 45, 48, 90 S. Ct.

200, 201-02, 24 L. Ed. 2d 214 (1969) (per curiam).

Plaintiffs filed suit primarily to secure reimbursement at the "reasonable and

adequate" rates required by the Boren Amendment.   Defendants argue that the

repeal of the Boren Amendment now renders Plaintiffs' suit moot.  They argue that

Congress intended its repeal  to prevent just this kind of suit against a state for

alleged inadequate reimbursement procedures.  Defendants point to several

portions of legislative history to argue that Congress's repeal of the Amendment

was intended to eliminate the substantive rate-setting requirements of the

Amendment (and the ample litigation attendant to those requirements) and replace

them with a strictly procedural "notice and comment" method for setting

reimbursement rates.[7]  Defendants therefore assert that the repeal of the

---

[7]A review of the legislative history makes clear that Congress was indeed concerned with the cost of health care provider suits against states and sought to curb the proliferation of such suits.  See, e.g., H.R. Rep. No. 149, 105th Cong., 1st Sess., at 1175-76.

18

Amendment effectively ended the substantive federal requirement on reimbursement rate-setting by states -- thereby mooting Plaintiffs' case.

We disagree as to the period prior to the repeal; indeed, Defendants do not seriously press this point. Congress's repeal of the Amendment empowered states to replace their existing Boren-compliant rate plans with new rate plans not subject to challenge based on the reasonableness and adequacy requirements of the Boren Amendment. Congress was explicit on how this change was to occur; states were to promulgate a rate plan and subject it to the "notice and comment" administrative procedure. Such a new plan, however, would cover only those services and items provided after October 1, 1997. Pub. L. 105-33, § 4711(d). Congress made clear that the Boren Amendment still applied to payment for items and services furnished before October 1, 1997. See id. Consequently, Plaintiffs' request for relief regarding services rendered prior to October 1, 1997 had not become moot by the time the district court entered judgment in April 1999.

To the extent the district court ordered Defendants' compliance with Boren standards beyond the date of final judgment, the issue is less clear on this record. The dispositive question is whether Florida has indeed passed a valid rate plan in accordance with the requirements of the Boren Amendment's successor. After the district court entered final judgment, Defendants filed a motion for reconsideration,

19

asserting that as of October 1, 1998 (after trial, but prior to entry of judgment) the State of Florida passed a new rate plan under the required "notice and comment" procedures. On this basis, Defendants argued that the lawsuit had become moot by the time of entry of judgment, because it would be impossible to grant prospective relief regarding the State's administration of the Boren-era rate plan when that plan had been superseded and the Boren Amendment's substantive requirements rendered inapplicable. The district court denied Defendants' motion, primarily on the ground that Defendants had produced no good reason for their failure to advise the Court of the new plan during the over six months that elapsed between the effective date of the new plan and the entry of final judgment.[8]

Normally we review a ruling on a motion for reconsideration under a deferential abuse of discretion standard. See Alcock, 993 F.2d at 806. A court abuses its discretion, however, when it misapplies the law. See, e.g., SunAmerica, 77 F.3d at 1333 (court necessarily abuses its discretion if it "has applied an incorrect legal standard"). When a motion for reconsideration raises a fundamental jurisdictional issue such as mootness, the court is obliged to consider the merits of the argument regardless of the motion's relative untimeliness. See, e.g.,

---

[8]Although the district court did say that it was "not convinced that the new evidence offered by Defendants would warrant a modification of the Final Judgment," there is no indication that the court considered the merits of Defendants' mootness argument or examined what that argument meant for its jurisdiction to issue a final judgment.

20

Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen, 815 F.2d 1435, 1445 n. 16 (11th Cir. 1987) ("[q]uestions of jurisdiction" such as mootness "can appropriately be raised at any time in the litigation"); Carr v. Saucier, 582 F.2d 14, 15-16 (5th Cir. 1978) (per curiam) ("If a controversy becomes moot at any time during the trial or appellate process, the court involved must dismiss the suit for want of jurisdiction. . . . Mootness arguments . . . can be pressed by any party at any time[.]"); see also Barilla v. Ervin, 886 F.2d 1514, 1519 (9th Cir. 1989) (because a court "may not decide the merits of a moot case, regardless of whether it was mooted before or after the entry of judgment," a court "cannot be divested of its obligation to consider the issue of mootness on the ground that the timing or manner in which a party has raised the issue is somehow procedurally improper").

If indeed the State had properly enacted a new post-Boren rate plan by the time of entry of final judgment, then a final order providing prospective relief with respect to the State's Boren-era plan would serve no purpose and that portion of the case -- if not the entire case -- would be moot.[9]  Accordingly, while we share the Plaintiffs' and the district court's concern with Defendants' failure to raise this issue promptly (a situation Defendants concede was "regrettable"), the district

---

[9]In light of our ruling regarding Plaintiffs' claims for retroactive relief, see infra Part III.B, the entire case would have to be dismissed if the court lacked subject matter jurisdiction to award prospective relief at the time of judgment.

21

court still was required to address Defendants' mootness argument, and if that argument had merit, to dismiss any claim for prospective relief on that ground.

That said, we are unwilling on this record to determine whether the new plan complies with the requirements of the post-Boren statute. Defendants contend that in conjunction with their motion for reconsideration they submitted affidavits confirming that the State has taken the new plan through the notice-and-comment process and that the plan fully complies with Boren's successor statute. Defendants also assert that Plaintiffs did not submit any affidavits of their own to dispute these claims. Given that Plaintiffs were responding to a motion for reconsideration, however, we attach little significance to their failure to submit counter-affidavits. Moreover, Plaintiffs suggest (although they do not state clearly) that the new plan may not be in compliance with the procedural requirements of the post-Boren statute. Appellees' Brief at 24. In these circumstances, we think, the wisest course is to remand the case to the district court so that it may determine in the first instance whether the new plan complied with the requirements of Boren's successor statute, and if so whether the lawsuit had become moot prior to the entry of judgment in April 1999. We therefore remand to the district court on this threshold jurisdictional issue.[10]

---

[10]Even assuming Plaintiffs are correct that Florida has not validly adopted a post-Boren rate plan, there remains a question as to what standards if any govern the post-Boren era in the

B.

We turn next to whether the Eleventh Amendment precluded the district court from ordering, in essence, that the Defendants rectify improper past payments to providers such as Plaintiffs. The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of

---

absence of such a plan. Defendants, for their part, assert that no federal standards govern the interim period and thus this lawsuit is moot (at least with respect to the post October 1, 1997 period) regardless of whether a valid post-Boren plan was adopted. The district court appears to have assumed that Boren Amendment standards continue to apply even after the Amendment's repeal unless and until the state adopts a valid post-Boren plan to replace its Boren-era plan. See 47 F. Supp. 2d at 1354 ("until such time as the State amends its Rate Plan in accordance with federal requirements, the Rate Plan in effect on the effective date of repeal of the Boren Amendment continues to apply"); 1361 (enjoining Defendants from "violation of the Boren Amendment . . . until the State adopts regulations, procedures and standards governing the reimbursement of ICF/DD providers in place of the standards set forth in the Boren Amendment"). But the district court did not offer any detailed explanation for its assumption, and we note, without deciding the issue, that courts have suggested different views on the matter. Compare Belshe, 188 F.3d at 1095 (rejecting argument that repeal of Boren Amendment had rendered moot a dispute about application of Boren requirements to Boren-era plan yet to be replaced after the effective date of the repeal) with Hall v. Sullivan, Second Cir., Nos. 97-7632(L) & 97-7642 (XAP) (Oct. 15, 1997), 129 F.3d 113 (table case) (dismissing appeal based on parties' agreement that their dispute about application of Boren requirements was mooted as of the effective date of the Boren Amendment's repeal) and HCMF Corp. v. Gilmore, 26 F. Supp. 2d 873, 878-80 (W.D. Va. 1998), on reh'g, 85 F. Supp. 2d 643 (1999) (ruling that the Boren Amendment's repeal effectively precluded any claim based on Boren for services rendered after the repeal date, even though the state had not yet passed a new plan of its own). Given our ruling that retrospective relief here is barred by the Eleventh Amendment, see infra Part III.B, resolving what standard applies to the post-Boren era would be unnecessary if the district court on remand found that the Defendants had adopted a valid post-Boren plan prior to the entry of judgment. We therefore need not and do not address now what standards govern in the post-Boren era in the absence of a validly adopted "notice and comment" plan.

23

any Foreign State." U.S. Const. amend. XI. The Amendment not only bars suits against a state by citizens of another state, but also bars suits against a state initiated by that state's own citizens. See Edelman v. Jordan, 415 U.S. 651, 663, 94 S. Ct. 1347, 1355, 39 L. Ed. 2d 662 (1974).

Under the doctrine of Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), there is a long and well-recognized exception to this rule for suits against state officers seeking prospective equitable relief to end continuing violations of federal law. See Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1336-37 (11th Cir. 1999) (citing Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 269, 117 S. Ct. 2028, 2034, 138 L. Ed. 2d 438 (1997) ("We do not . . . question the continuing validity of the Ex parte Young doctrine.")), cert. denied, 120 S. Ct. 1287, 146 L. Ed. 2d 233 (2000). The availability of this doctrine turns, in the first place, on whether the plaintiff seeks retrospective or prospective relief.

Ex parte Young has been applied in cases where a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past. Thus, Ex parte Young applies to cases in which the relief against the state official directly ends the violation of federal law, as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or simply

24

to compensate the victim. "'Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'" Summit Med. Assocs., 180 F.3d at 1337 (quoting Papasan v. Allain, 478 U.S. 265, 277-78, 106 S. Ct. 2932, 2940, 92 L. Ed.2 d 209 (1986)). Therefore, the Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages. See Green v. Mansour, 474 U.S. 64, 68, 106 S. Ct. 423, 426, 88 L. Ed. 2d 371 (1985); Sandoval v. Hagan, 197 F.3d 484, 492 (11th Cir. 1999) ("[Individual suits that seek prospective relief for ongoing violations of federal law . . . may be levied against state officials."). If the prospective relief sought is "measured in terms of a monetary loss resulting from a past breach of a legal duty," it is the functional equivalent of money damages and Ex parte Young does not apply. Edelman, 415 U.S. at 669, 94 S. Ct. at 1347.

Plaintiffs' suit originally fell within the Ex parte Young exception. Their suit was directed against state officials in their official capacities and asked for prospective injunctive relief to halt continuing violations of federal law. Plaintiffs are not barred by the Eleventh Amendment from seeking enforcement, in a federal

25

court, of a federal statute which state agents have violated. Defendants, in fact, do not argue that Plaintiffs' suit was barred from the outset. Instead, they make a more focused argument that much of the relief ordered by the district court is retrospective rather than prospective. They assert that, to the extent the district court directed them to make changes to the State's Boren-era reimbursement plan retroactive to September 4, 1991, it essentially required them to redress inequities in their past reimbursement payments from 1991 to the date of final judgment (April 1999), and potentially to reimburse Plaintiffs for those past deficiencies. We reluctantly agree.

To begin with, we note that the judgment clearly does contemplate the payment of state funds to redress prior inadequate reimbursements. Defendants observe that the final judgment does not expressly require them to pay any money or arrears in reimbursements. Technically speaking they are right. It is obvious, however, that the entire purpose and effect of the judgment is to prescribe a set of standards upon which Defendants are to provide reimbursement for inadequate past and future payments, and that failure to provide such reimbursement would subject them to sanctions by the federal district court, which expressly "retain[ed] jurisdiction to enforce [its] Order." 47 F. Supp. 2d at 1361. Plaintiffs view the judgment in those terms. See Appellee's Brief at 39 (arguing that "the Eleventh

26

Amendment does not preclude the payment of money which Defendants have withheld improperly"). If the order were read as nothing more than an idle declaration of Defendants' past obligations, without any intent or authority on the part of the district court to enforce its ruling, then the order would be a nullity and plainly invalid on that basis alone. We decline to adopt such an unrealistic reading of the district court's order.

Because some of the relief ordered in the final judgment requires the State in effect to rectify improper past payments, we see no way to distinguish the holding of Edelman which prohibits exactly this sort of retroactive award. Edelman itself illustrates the problem. There, a plaintiff sought declaratory and injunctive relief against two former directors of the Illinois Department of Public Aid, alleging that those state officials were administering the federal-state programs of Aid to the Aged, Blind, or Disabled (AABD) in a manner inconsistent with various federal regulations and the Fourteenth Amendment to the Constitution. The plaintiff's complaint charged that the defendants were improperly authorizing grants to commence only with the month in which an application was approved and were not including prior eligibility months for which an applicant was entitled to aid under federal law. The complaint also alleged that the defendants were not processing

the applications within the applicable time requirements of the federal regulations.

The district court granted a permanent injunction requiring compliance with the federal time limits for processing and paying AABD applicants. It also ordered the defendants to pay retroactively benefits which would have been awarded if defendants had complied with federal law. The Seventh Circuit reversed, holding that this retroactive relief was barred by the Eleventh Amendment, and the Supreme Court agreed. In this now-famous ruling, the Court articulated the retrospective/prospective dichotomy for Eleventh Amendment caselaw: prospective injunctive or declaratory relief can be awarded but retrospective relief cannot. The Supreme Court explained:

> [T]hat portion of the District Court's decree which petitioner challenges on Eleventh Amendment grounds goes much further than any of the cases cited. It requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard. While the Court of Appeals described this retroactive award of monetary relief as a form of 'equitable restitution,' it is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the

28

action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.

415 U.S. at 668, 94 S. Ct. at 1358.

The district court judgment in this case effectively requires Defendants to redress inadequate past reimbursement payments by recalibrating the rates and paying Plaintiffs the difference out of the state treasury. But the Eleventh Amendment bars the award of retroactive relief for violations of federal law. The fact that harm is ongoing in the sense that Plaintiffs are continuing to suffer the effects of Defendants' prior failure to reimburse them adequately does not make the relief any less retrospective. Quite simply, the Eleventh Amendment's immunity is triggered when an declaration or injunction effectively calls for the payment of state funds as a form of compensation for past breaches of legal duties by state officials. See id.; Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 102-03, 104 S. Ct. 900, 909, 79 L. Ed. 2d 67 (1984). Such is the case here.

The district court tried to avoid this limitation by describing the relief decreed in its final order as simply enforcing the 1991 preliminary injunction; thus, reasoned the court, the relief was not retrospective and did not run afoul of the Eleventh Amendment.[11] We are unpersuaded. To begin with, the district court's

_____

[11]The district court explained its relief this way:

29

reasoning cannot be squared with the command of the Eleventh Amendment as it has been interpreted in <u>Edelman</u> as well as other decisions of the Supreme Court and this Court. Moreover, even assuming that the district court's reasoning could be squared with binding precedent, the 1991 preliminary injunction was not enforceable on its own terms and thus could not serve as the basis for the district court's retroactive relief. Finally, the district court's judgment imposed reimbursement obligations starkly different from and more detailed than those contemplated by the preliminary injunction. For each of these independent reasons, which we address in sequence below, the retrospective relief ordered by the district court violates the Eleventh Amendment.

First, we are aware of no federal court that has upheld against Eleventh Amendment scrutiny a final judgment requiring a state to pay money for illegal

---

[B]ecause compliance by the Defendants with the Preliminary Injunction entered by this Court required expenditure of State funds, such expenditures are ancillary to preliminary injunctive relief entered. In this case, the Court has, since September 13, 1991, enjoined Defendants from reimbursement at inadequate rates and reimbursing cluster providers "in a manner other than as provided in a Rate Plan" at the "full Medicaid rate." Defendants' conduct, therefore, constitutes a continuing violation of the Medicaid Act and Plaintiffs' statutory rights. Further, the portion of Plaintiffs' claim relating to inadequate reimbursement occurring since the Preliminary Injunction represents injuries arising after Defendants were ordered to comply with the Medicaid Act and are therefore prospective in nature.

47 F.Supp.2d at 1359-60.

30

conduct which pre-dates the judgment on the theory that the conduct violated an earlier preliminary injunction and therefore the remedy was prospective. The requirements imposed by the district court in its April 11, 1999 final judgment with respect to reimbursement for services rendered prior to that date are undeniably retrospective, and cannot be justified as merely "relating back" to the date of the preliminary injunction. If Plaintiffs or the district court felt that Defendants had violated the preliminary injunction, the remedy would have been to conduct a show cause hearing and, if appropriate, to pursue civil contempt requiring Defendants to pay rates or provide reimbursement in accordance with the injunction.[12] But the district court could not, at least in the peculiar circumstances of this case, avoid the constraints of the Eleventh Amendment by relying on Defendants' past violations of the preliminary injunction to justify imposing plainly retroactive relief in its final judgment. See Kostok v. Thomas, 105 F.3d 65, 69 (2d Cir. 1997) ("Any claim for retroactive monetary relief, under any name, is barred . . .. When state funds are awarded to compensate for past wrongs by state officials, the Eleventh Amendment bars the payment as retrospective." (citing Edelman and Green)).

---

[12]As discussed above, supra note 4, Plaintiffs' numerous contempt and sanctions motions never squarely challenged the court-ordered rate plan or the rates paid under it. We offer no opinion as to how the Eleventh Amendment might have impacted such a contempt proceeding.

Second, even if we assume that such a "relation back" theory could be used to avoid the constraints of the Eleventh Amendment in some cases, here there are more fundamental problems with the district court's reasoning. The underlying preliminary injunction lacked the precision and specificity necessary for it to be enforceable prospectively from the date of its entry in 1991, let alone to serve as the linchpin of the district court's "relation back" theory eight years later. Fed. R. Civ. P. 65(d) requires that a preliminary injunction be "specific in its terms" and "describe in reasonable detail . . . the act or acts sought to be restrained." The district court's preliminary injunction did not meet these criteria; on the contrary, it accomplished little more than enjoining Defendants from violating the law. It stated that Defendants were enjoined from "inadequately reimbursing providers of care in the ICF/[DD] program," and from "paying providers for services at ICF/[DD] cluster facilities in a manner other than as provided for in a rate plan" that "pay[s] to each provider of ICF/[DD] services at cluster facilities the full Medicaid rate for that facility" and affords "each provider at cluster facilities all rights and protections accompanying a rate plan governing ICF/[DD] facilities." The injunction order specifically declined to modify the State's existing plan by imposing new rates, but rather permitted Defendants themselves to file a new plan "which complies with the substantive requirements of" the Medicaid Act.

32

This Circuit has held repeatedly that "obey the law" injunctions are unenforceable. See, e.g., Burton v. City of Belle Glade, 178 F.3d 1175, 1200 (11th Cir. 1999) (holding that injunction which prohibited municipality from discriminating on the basis of race in its annexation decisions "would do no more than instruct the City to 'obey the law,'" and therefore was invalid); Payne v. Travenol Labs., Inc., 565 F.2d 895, 899 (5th Cir. 1978) (invalidating injunction that prohibited defendant from violating Title VII in its employment decisions). The specificity requirement of Rule 65(d) is no mere technicality; "[the] command of specificity is a reflection of the seriousness of the consequences which may flow from a violation of an injunctive order." Payne, 565 F.2d at 897. An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law. See Meyer v. Brown & Root Constr. Co., 661 F.2d 369, 373 (5th Cir. 1981) (citing International Longshoremen's Assoc. v. Philadelphia Marine Trade Assoc., 389 U.S. 64, 76, 88 S. Ct. 201, 208, 19 L. Ed. 2d 236 (1967)). The preliminary injunction in this case differs little from an "obey the law" order because it fails to identify with adequate detail and precision how Defendants are to perform such critical obligations as "[]adequately reimbursing providers of care" and "compl[ying] with the substantive requirements of" the Medicaid Act.

33

Third, even if the preliminary injunction were valid and enforceable, the injunctive relief awarded by the district court's final order of April 11, 1999 was not the same as that ordered by the preliminary injunction. On the contrary, the final order imposed more expansive, and far more detailed, obligations on Defendants for the post-September 1991 period than those imposed prospectively in the preliminary injunction. The preliminary injunction, as noted above, essentially enjoined the Defendants from violating the law and directed them to submit a new rate plan that complied with the law. The final judgment went much further, ordering ten specific alterations to the rate plan, including requirements that Defendants use "[t]hree year averaging of cost reports . . . to calculate rate reductions," delete "[t]he cap on rates for new facilities with six beds or less," set rates for providers at small facilities based on "an average (or collectively) for all six bed ICF/DDs operated by that provider," and "rebase whenever actual costs exceed actual expenditures for 50% or more of providers in any rate period as shown on KM Schedules of cost reports maintained by Defendants." Regardless of whether a "relation back" theory comports with current Eleventh Amendment doctrine, the final judgment plainly cannot relate back to an altogether different and far less precise injunction.

34

In short, the relief ordered by the district court's final injunction did not become validly prospective simply because it was intended to redress past violations of the earlier preliminary injunction.

For its conclusion the district court relied primarily on <u>Rye Psychiatric Hospital Center, Inc. v. Surles</u>, 777 F. Supp. 1142 (S.D.N.Y. 1991). The court also cited <u>Libby v. Marshall</u>, 653 F. Supp. 359 (D. Mass. 1986) and <u>Bennett v. White</u>, 865 F.2d 1395 (3d Cir. 1989). Plaintiffs likewise rely on these opinions, as well as an unpublished ruling, <u>Kansas Health Care Association, Inc. v. Kansas Department of Social and Rehabilitation Services</u>, No. 93-4045-RDR (D. Kan. May 31, 2000). None of these decisions is binding precedent in this Circuit and none alters our conclusion.

In <u>Rye</u>, the court issued a partial summary judgment ruling finding that the defendants were providing inadequate reimbursement to the plaintiff Medicaid provider. The plaintiff later sought a show cause order compelling the defendants to use the proper formula to reimburse it for services rendered subsequent to the summary judgment ruling as well as for the four years preceding that ruling. The court began its analysis of the show cause request by highlighting the longstanding principles we apply here. 777 F. Supp. at 1146 ("Simply put, the eleventh amendment bars the award of retroactive relief for violations of federal law which

35

would require the payment of funds from a state treasury. . . . [T]he amendment's immunity is triggered when relief amounts to the payment of state funds as a form of compensation for past breaches of legal duties by state officials."). The court held that granting relief for the four years preceding the summary judgment ruling would be prohibited. Id. at 1147-51. Nevertheless, it concluded, without elaboration, that "[t]he portion of plaintiff's action relating to inadequate reimbursement payments and improper rate methodologies occurring since [the ruling] represents injuries arising after the court issued its decision. Relief for these injuries is clearly prospective in nature." Id. at 1147.

Rye does not help the Plaintiffs in this case. In Rye, the relief granted by the district court for the post-summary judgment period arguably may be viewed as prospective because the relief covered a period after a final ruling on the merits of the plaintiff's claim had been rendered. Moreover, the relief was granted pursuant to a show cause application. Here, by contrast, the relief ordered by the district court for the September 1991-April 1999 period cannot be viewed as enforcing a prior order finally deciding the merits of Plaintiffs' claim. At best, it enforced a non-final determination of Plaintiffs' claim made in connection with the preliminary injunction order. Additionally, the district court was not considering a show cause or contempt application, which would have been the proper vehicle for Plaintiffs to

seek relief for any alleged violation of the preliminary injunction. The factual

differences between <u>Rye</u> and this case are significant. In any event, to the extent

<u>Rye</u> may be read to endorse the reasoning applied by the district court in this case, it

is odds with Eleventh Amendment doctrine applied by the Supreme Court.[13]

In <u>Libby</u>, the district court found that the Eleventh Amendment did not

prohibit it from entering an injunction requiring state officials to spend state funds

to improve prison conditions in order to comply with a prior preliminary injunction

---

[13]<u>Kansas Health Care Association</u> is unhelpful for many of the same reasons as <u>Rye</u>. There, the district court issued a preliminary injunction in a Boren Amendment case enjoining the operation of reimbursement rates in defendants' Medicaid plan, directing the development of new rates, and directing that an interim rate be paid pending the adoption of the new rates. The injunction directed that funds equivalent to the difference between the interim rates and the old rates be deposited into a court-supervised escrow account (a procedure to which defendants agreed). Three months after entry of the preliminary injunction, the defendants adopted new rates, which the plaintiffs did not challenge. Shortly before trial, Defendants moved to dismiss on Eleventh Amendment grounds, arguing that any final judgment awarding the escrowed funds to the plaintiffs would constitute retrospective relief. The district court (relying on the district court's decision in the case now before us) rejected that argument, explaining that the funds had already been paid by the defendants and thus the final judgment would not impose any further drain on the state treasury. The court also ruled that the payment of funds was simply ancillary to a valid prospective injunction, and that the funds represented defendants' "continuing obligation" under the terms of the preliminary injunction.

<u>Kansas Health Care Association</u> is an unpublished opinion and carries little weight. Its application of the retrospective/prospective distinction required by cases such as <u>Edelman</u> is open to substantial debate. A court order requiring the payment of funds from the state treasury to redress prior harm by state actors is barred by the Eleventh Amendment regardless of whether, as an intermediate step, the funds were placed at the court's direction into an escrow account for the specific purpose of preserving them in order to compensate the plaintiffs. The factual differences between that case and the case at bar also are significant. Among other things, here Defendants did not pay any funds into escrow in compliance with the preliminary injunction, and therefore any payment for prior inadequate reimbursements would undeniably come directly from State coffers. Moreover, as noted above, in this case the preliminary injunction itself was insufficient.

37

imposing a cap on the jail's population. The court described the additional relief as ancillary to a "substantive prospective injunction" and necessary to ensure future compliance with the prior injunction. 653 F. Supp. at 363. Libby concerns a well-recognized exception to the Eleventh Amendment for ancillary monetary relief. That exception is inapposite, however, because the 1991 preliminary injunction, besides being unenforceable, did not simply seek to regulate Defendants' future conduct without necessarily requiring the expenditure of funds. On the contrary, this preliminary injunction plainly contemplated the expenditure of funds by the State in accordance with required Boren Amendment rates. The relief awarded by this final judgment with respect to events pre-dating the judgment cannot remotely be described as an "ancillary" remedy necessary to ensure future compliance with the terms of the preliminary injunction.

The Third Circuit's opinion in Bennett v. White is inapposite as well. Bennett involved a challenge to a state's administration of a child support benefits program under the auspices of the Social Security Act. The district court found, among other things, that the defendants had improperly withheld certain payments due to the plaintiffs. The district court declined, however, to order defendants to make those payments. Plaintiffs challenged that ruling on appeal, asserting that "Edelman v. Jordan should be construed as inapplicable to their suit because they

38

are not seeking the recovery of entitlements to government benefits funded by general revenues, but only the recovery of their own property." 865 F.2d at 1407. The Third Circuit rejected the argument, stating that Edelman "prevents a federal court from requiring state officers to disgorge from the state treasury even unlawfully converted property, at least so long as the state pays for the disgorgement." Id. at 1408. The court suggested in dicta an exception to this principle in instances where payments from the state treasury would be offset by payments into the treasury by the federal government. Id.

Such an exception has not been recognized by this Circuit, and cannot readily be squared with the Supreme Court's Eleventh Amendment jurisprudence. But even assuming that it has any validity, it does not help the Plaintiffs here. Although Plaintiffs speculate that the State of Florida may "financially benefit from modifications ordered in the Final Judgment through additional federal funding," Plaintiffs' Supplemental Brief at 2, there is no record evidence for this proposition, and in any event it is of no legal consequence under the Supreme Court and this Court's binding precedent, which focus on whether the "judgment . . . would implicate the state treasury," not whether as a bottom line matter the state treasury would be any worse off. Shands Teaching Hospital and Clinics Inc. v. Beech Street Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) (emphasis added). And

39

although in <u>Bennett</u> the Third Circuit declined to reverse the district court's decision to order back payments for improperly withheld funds in a limited set of cases, the defendants had conceded that issue and thus no Eleventh Amendment scrutiny was applied. <u>Bennett</u> does not justify the result here.

Simply put, in this case, as in <u>Edelman</u>, the relief would amount to direct state reimbursement for past unlawful conduct. Although the retrospective relief only extends back to the preliminary injunction, because the injunction was entered almost eight years prior to final judgment, it would plainly amount to an award for past due benefits in contravention of <u>Edelman</u>. The proper recourse for Plaintiffs would have been to obtain a contempt order after Defendants failed to comply with the district court's preliminary injunction. The relief awarded in the final judgment is essentially a surrogate for such a civil contempt award. Accordingly, we cannot characterize Defendants' reimbursement of past due payments as anything but impermissibly retroactive. The district court lacked jurisdiction to order that Defendants recalibrate the rates for the September 1991-April 1999 period and pay Plaintiffs any arrears, because such relief plainly would require the payment of money from the state treasury to redress past unlawful conduct toward the Plaintiffs.[14]

---

[14]During oral argument, we requested the parties to submit supplemental briefing on two related issues: (1) whether the State of Florida, by accepting federal Medicaid funds, waived its

40

Eleventh Amendment immunity pursuant to the congressional power under the Spending Clause to condition a state's receipt of federal funds on a knowing waiver of state sovereign immunity; and (2) the effect on this case of the Supreme Court's decision in Wilder v. Virginia Hospital Ass'n, 496 U.S. 498, 502, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990). Defendants contend that the State has not waived its Eleventh Amendment immunity by accepting Medicaid funds because the Medicaid statute does not contain an express and unmistakable statement that Congress intended to condition the receipt of funds on a waiver of immunity. Defendants also contend that Wilder is inapposite because it only addressed the question of whether the Boren Amendment is enforceable in an action by health care providers under section 1983. Plaintiffs do not meaningfully contest either contention.

We agree with Defendants' view on these issues. Under the Spending Clause waiver theory, a state may waive its sovereign immunity by accepting federal funds. See Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.1, 105 S. Ct. 3142, 3145 n.1, 87 L. Ed. 2d 171 (1985) ("a State may effectuate a waiver of its constitutional immunity by . . . waiving its immunity to suit in the context of a particular federal program"); Sandoval, 197 F.3d at 492-93. But a Spending Clause waiver requires an "unequivocal indication" by Congress that a State accepting funds thereby waives its claim to immunity -- either "'by the most express language or by such overwhelming implication from the text as (will) leave no room for any other reasonable construction.'" Edelman, 415 U.S. at 673, 94 S. Ct. at 1347 (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S. Ct. 458, 464, 53 L. Ed. 742 (1909)).

The Medicaid Act contains no clear statement of intent to condition receipt of Medicaid funds on a waiver of state sovereign immunity. Indeed, Congress has rejected the inclusion of such a statement in the Act. In 1975 Congress amended the Act to require states to waive any Eleventh Amendment immunity from suit for violations of the Act. See Pub. L. 94-182, § 111, 89 Stat. 1054; H.R. Rep. No. 94-1122, at 4. The provision generated tremendous opposition from the states, however, and was repealed during the next session of Congress. Pub. L. 94-522, 90 Stat. 2540. Plaintiffs direct us to no language in the Act that represents an unequivocal indication by Congress that states accepting federal Medicaid funds do so on condition that they have knowingly waived their Eleventh Amendment protection.

The Supreme Court's 1990 decision in Wilder does not affect that analysis. See Yorktown Med. Lab., Inc. v. Perales, 948 F.2d 84, 88 (2d Cir. 1991) (noting that even after Wilder the Boren Amendment "does not authorize retroactive suits for the recovery of compensation due"). In Wilder, as noted above, the Supreme Court held that "the Boren Amendment imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates and that this obligation is enforceable under § 1983 by health care providers." 496 U.S. at 512, 110 S. Ct. at 2518-19. The Court did not address any Eleventh Amendment issue, and certainly did not hold that by accepting funds under the Medicaid Act a state waives its immunity. Moreover, the plaintiffs in Wilder were only seeking prospective injunctive relief against state officials, see id. at 505, 110 S. Ct. at 2515, and thus no Eleventh Amendment issue was presented (unlike here, where the district court awarded plainly

41

To the extent the district court order contemplates the payment of state funds to remedy unlawful conduct prior to the date of the final judgment, the judgment is prohibited by the Eleventh Amendment, and we are constrained to vacate it. This includes all of the changes to the reimbursement plan required "retroactive to September 4, 1991" by paragraph 2 of the district court's Conclusion. See 47 F. Supp. 2d at 1360. This also includes the requirement in paragraph 3 of the Conclusion that Defendants conduct an "immediate rebasing for the 1995 rate setting period where it failed to rebase," and the portion of paragraph 4 which enjoins the Defendants from violating the Boren Amendment from September 13, 1991 to the date of judgment. Id. at 1361.

We do not rule at this time on whether the prospective relief ordered by the district court also is barred by the Eleventh Amendment. Although a federal court is prohibited by the Eleventh Amendment from ordering a state to provide retrospective relief, there are very limited circumstances where a court may enter an order implicating the state treasury if such payments will be nothing more than ancillary to compliance with a enforceable prospective injunction prohibiting future

retrospective relief). Wilder did not hold that a provider can sue under section 1983 in federal court to obtain an order imposing retrospective relief that otherwise would be barred by the Eleventh Amendment. Accordingly, Wilder does not dictate the outcome here.

unlawful conduct by state officials. See, e.g., Milliken v. Bradley, 433 U.S. 267, 289, 97 S. Ct. 2749, 2762, 53 L. Ed. 2d 745 (1977); DeKalb County Sch. Dist. v. Schrenko, 109 F.3d 680, 690-91 (11th Cir. 1997) (per curiam) (noting Eleventh Amendment exception that "permits federal courts to enjoin state officials to conform their conduct to the requirements of federal law, even if there is an ancillary impact on the state treasury," but finding that injunction at issue was barred by the Eleventh Amendment because the obligation to make future payments was not merely ancillary). How this exception survives more recent pronouncements of Eleventh Amendment doctrine, and whether some portions of the district court's order may conceivably come within this exception, are potentially difficult questions that need not be answered if on remand the district court determines that any question of prospective relief had already become moot by the time it entered final judgment. See supra at 22.[15]

_____

[15]Deferring resolution of this potentially unnecessary issue is consistent with the longstanding rule that constitutional questions should not be resolved unless necessary to the decision. See, e.g., I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1553 (11th Cir. 1986). Moreover, mootness is a jurisdictional issue that must be resolved at the threshold. See North Carolina v. Rice, 404 U.S. 244, 246, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413 (1971) ("The question of mootness is . . . one which a federal court must resolve before it assumes jurisdiction."). Although this Court has described the issue of Eleventh Amendment immunity as itself one of subject matter jurisdiction, see Seaborn v. State of Florida, Department of Corrections, 143 F.3d 1405, 1407 (11th Cir. 1998), cert. denied, 526 U.S. 1144, 119 S. Ct. 1038, 143 L. Ed. 2d 46 (1999), mootness -- like standing and ripeness -- raises an even more basic question of jurisdiction that cannot be waived and goes to the very heart of the "case or controversy" requirement of Article III. At least in this context, therefore, questions of mootness ought to be resolved first. See Ainsworth Aristocrat Int'l Pty. Ltd. v. Tourism Co. of the

We do not reach these results without misgivings. The issues raised in this case by the Plaintiffs are extremely serious and vitally important to the large group of developmentally-disabled persons who rely on the fair and proper administration of the State's Medicaid program. As we have noted, Defendants do not dispute the district court's findings of fact or conclusions of law, which detail at length Defendants' violations of the Boren Amendment and federal law. Moreover, we acknowledge Plaintiffs' concern that some of the long lapse between the commencement of this case and the entry of judgment (as a result of which the basis for the case -- the Boren Amendment -- was repealed) may be attributed to Defendants' repeated requests for continuances. Still, we must observe the commands of the Eleventh Amendment and binding Supreme Court precedent, which forbid precisely the kind of retrospective relief awarded by the district court.

In light of these circumstances, and given the time and resources that this litigation has already entailed, we encourage the Defendants to seek a just resolution of the Plaintiffs' reimbursement claims. We also stress that, whatever the relief (if any) available in federal court, our decision does not preclude the Plaintiffs

---

Commonwealth of Puerto Rico, 693 F. Supp. 1354, 1357 (D.P.R. 1988) (refusing to rule upon Eleventh Amendment question after finding initially that case was moot), aff'd, 899 F.2d 852 (1st Cir. 1989) (table case). Finally, declining to review this issue now permits the district court on remand (if it concludes the case is not moot) to examine the scope of its prospective relief in light of the Eleventh Amendment principles set forth in this opinion.

44

from seeking relief that still may be available to them in the Florida state courts, where the paramount jurisdictional concerns addressed in this opinion do not apply.

VACATED IN PART AND REMANDED IN PART.